109 So.2d 7 (1959)
Philip B. SINGER, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
February 13, 1959.
*10 Hollis V. Knight, Starke, for appellant.
Richard W. Ervin, Atty. Gen., and Reeves Bowen, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
Defendant Philip B. Singer was indicted and tried for the murder of Marilyn Burch Fagan. The jury returned a verdict of guilty of murder in the first degree and made no recommendation to mercy for the defendant. The court accordingly entered its judgment and sentence of execution against the defendant. Defendant's motion for new trial was denied and he thereupon instituted this appeal.
Defendant raises ten points on appeal, none of which questioned the sufficiency of the evidence to support the conviction of murder in the first degree. However, under § 924.32, Fla.Stats. 1957, F.S.A., this Court is compelled to review the evidence to determine whether the interests of justice require a new trial, even though the sufficiency of the evidence not be questioned on appeal. In his reply brief defendant concedes that, taking the case as a whole, the evidence submitted by the State supports a conviction of murder in the second degree. We have carefully satisfied ourselves as to the sufficiency of the evidence to support the judgment and sentence. It is unnecessary to recite all of the facts in detail. We will relate only those necessary to a discussion of the points raised here.
The defendant, a deaf-mute, was, in February 1955, employed by the Gainesville Golf and Country Club as a maintenance man. On April 6, 1956, defendant was notified by letter that on April 13, 1956, his employment would be terminated in the interest of economy. Defendant was notified on April 10, 1956, to take the rest of the week off with pay. On the next day defendant returned to the Country Club and communicated by note to the club's manager, Mr. Earl Sasser. Mr. Sasser testified that defendant in the note told him that he would get even with Mr. Sasser even if he had to take it out on Sasser's family. Mr. Sasser said that when he had read the note the defendant jerked it out of his hands, tore it up and put it in his pocket.
As a result of defendant's visit to the Club on that day, Mr. Sasser went to the County Judge's office and upon his affidavit had a warrant for trespass issued against the defendant. Warrant was served upon defendant and before the trial he went on several occasions to the office of the County Prosecuting Attorney, Mr. Osee Fagan, in an effort to get the case dismissed. The case proceeded to trial and, with Mr. Fagan prosecuting, the defendant was convicted and sentenced to serve a period of time in the county jail.
The defendant furnished bond and was released from the jail. He was taken to his home by his bondsman, who testified that when they reached his home the defendant's wife was not present but had left defendant a note. The witness said that defendant, after reading the note, became very upset and stated that his wife had left him.
The evidence next placed defendant in Gainesville on August 20, 1956, three days before the death of Mrs. Osee Fagan, Marilyn Burch Fagan. A witness testified that he saw him at that time in the city riding in a Ford automobile.
Another witness, a resident of California, testified that the last time he saw *11 his Ford auto in California was on July 23, 1956. The auto was found subsequent to the killing of Mrs. Fagan abandoned near the bus station in Gainesville. One of the defendant's fingerprints was found upon its steering wheel. Mr. Fagan testified that this automobile conformed to the impression he received of the automobile seen by him as related in the following paragraph.
Mr. Fagan testified that on the night before his wife's death he saw a Ford automobile stopped directly in front of his house. The car moved on, turned around and returned, and its occupant flashed a flashlight above the front door of the Fagan residence. At that point Mr. Fagan turned on his outside light and stepped out the front door, whereupon the auto left hurriedly.
The next night Mr. Fagan left home about 7:20 P.M., immediately after his wife had left to go to her mother's home to get their little girl. She left her mother's home at about 7:45 P.M. Her mother's home was about two miles from their home.
A neighbor of the Fagans testified that at some time during the evening he heard what sounded like a commotion or scuffling, followed by what he thought to be a plea for help in a high-pitched voice. He then heard what seemed to be two shots, although they sounded more like cap pistols. A few seconds later he heard a car speed off. He went out into his yard and observed only that a party was in progress at a house across the street, presumed the commotion he had heard came from there and made no further investigation.
Mr. Fagan returned home about midnight and found his wife's body on the walkway in front of his house. She had been shot by a pistol and medical testimony was that death from the shot had been almost immediate.
On the same night, between 9:00 and 9:05 P.M., Mrs. Earl Sasser, wife of the Gainesville Golf and Country Club manager, heard someone at the latched screen door to the front porch of her house. She stepped out onto the porch and spoke three times to the man she saw standing there, but he did not reply. She then observed that he was holding a gun in his hand. She ran into the house as he fired. The bullet missed her and she screamed for help to a neighbor. Mrs. Sasser testified that although she could not see the man's face, she was satisfied that she recognized him as the defendant.
Testimony was adduced that the defendant on that night boarded a bus which left Gainesville at 9:25 P.M. for Jacksonville, Florida. He registered at a hotel there under an assumed name but left shortly after registering, buying an airplane ticket to Washington, D.C. under another assumed name.
In November of 1956 the police in Winnipeg, Canada received information as to the whereabouts of the defendant in that city. They went to that spot, found the defendant and placed him under arrest. He wrote them a note saying, "I will co-operate with you. Let me pack neat now."
A .32 calibre revolver was found in the defendant's house and subsequently F.B.I. ballistic experts concluded it was the gun which fired the bullet which killed Mrs. Fagan.
After his arrest defendant, who had been residing in Winnipeg under still another assumed name, was carried to the detective inspector's office in Winnipeg. The following communication, in the form of written inquiries by the Canadian police and written replies by the defendant, took place:
"Q. What is your name? A.I guess you know my real name Philip Singer.

*12 "Q. Where are you from? A. New York.
"Q. Do you know why we arrested you? A. Yes, sir.
"Q. Do you wish to give us a statement? A. I would like to have the public counsel.
"Q. I will tell you that you might be charged with murder. You are not bound to say anything, but anything you do say will be taken down in writing and may be used as evidence. A. I didn't know about murder, I want asylum in Canada. Florida justice is unfair."
"Q. Why do you say Florida justice is unfair? A. Last time  for trespassing I was tried by jury without lawyer."
The defendant then wrote "I didn't know they said me murder", and the policeman replied "I guess the woman died." The defendant then replied "I didn't see her die." The questioning continued as follows:
"Q. Did you shoot her? A. Accident on shoulder.
"Q. Is it your gun that we found in the suitcase? A. Yes.
"Q. Do you want to say any more? A. Will Eva come here tonight?
"Q. No visitors tonight. A. I want to say a few words to her. She is a wonderful woman. I help her a little. She knows nothing about me.
"Q. We have to see the Inspector tomorrow before you see any visitors. A. I have been here three months working. Forget about gun.
"Q. What was the name of the girl that was shot? A. Wife of prosecutor.

"Q. Is this the same gun that you shot her with? A. I'm helpless. I would rather talk to public counsel. I'll fight extradiction."
Prior to trial, the court appointed counsel for defendant, who had been adjudicated to be insolvent. The defense counsel filed a motion for Removal of Cause on the grounds the State had an undue influence over the minds of the inhabitants of the County and the defendant was the subject of great public hostility in the County aroused by newspaper publicity. This motion was denied and defendant's challenges for cause to several of the jurors were overruled.
The case proceeded to trial with the results previously noted. Defendant made a motion for new trial on the grounds, among others, that the court erred in denying his motion for removal of cause; in denying his challenges for cause to each of six different jurors; in admitting into evidence testimony as to his alleged attack on Mrs. Sasser; in admitting his so-called "confession" made to the Canadian police; and in failing to instruct the jury to disregard certain portions of the argument made by the prosecuting attorney in his address to the jury. This motion was also denied.
Defendant argues that even if the evidence supports a murder in the first degree verdict, and we have satisfied ourselves it does, he was not given a fair trial before an impartial jury on the all important matter of recommendation of mercy. Under § 782.04, F.S.A., the penalty for first degree murder is death, but under § 919.23 if a majority of the jury recommends mercy the punishment is a mandatory sentence to life imprisonment, which is equal to the maximum punishment prescribed for murder in the second degree. The importance of the question of a recommendation of mercy in a conviction of first degree murder is obvious.
We will first examine the trial court's action to determine whether it erred in denying the motion for removal of the *13 cause. Defendant's motion presented the following facts: that the deceased was the wife of Osee Fagan, who was popular and influential in the county and had been county prosecuting attorney since 1953; the Fagans were active in the affairs of one of the largest churches in the county; the deceased was the daughter in a family long prominent in the county; the efforts of the county sheriff to apprehend the defendant had been widely publicized; publicity had been given to the alleged dangerous character of the defendant and to the fact that armed guards had been placed around the Fagan and Sasser homes prior to defendant's apprehension; the Bar Association of the Circuit had offered and publicized a reward for the arrest and conviction of the slayer of Mrs. Fagan; a special assistant had been appointed to assist the prosecution; the defendant was insolvent and the court had appointed an out-of-county attorney to represent him; and that the defendant was a deaf-mute occupying menial positions and was publicized in the local newspaper, which enjoyed the confidence of the public in the county, as a dangerous convict.
Accompanying the motion were original copies of the newspapers containing accounts of the crime and concerning the defendant. Various affidavits were filed supporting the allegations of the motion.
In opposition to the motion the State filed its traverse supported by more than eighty affidavits. The traverse denied that either Osee Fagan, the Burch family, the sheriff or the local newspaper exercised any undue influence over the minds of the inhabitants. It asserted that the posting of the reward was for the apprehension of the person or persons responsible for Mrs. Fagan's death and was not posted for the apprehension and conviction of the defendant. It explained that the appointment of a special assistant for the prosecution was due to the pressure of the size of the docket for the circuit and was not a reflection of public sentiment. Also it asserted that the appointment as defense counsel of Hollis V. Knight, an attorney from a county other than the one in which the crime was committed, was made primarily because of the long experience of that attorney in the trial of criminal cases. The many affidavits filed in support of the traverse asserted that the defendant could obtain a fair and impartial trial in the county.
Defendant's contention is that he could not obtain a fair and impartial trial by jury composed of friends, clients, neighbors and civic associates of the deceased woman's husband. He argues that in a case where recommendation of mercy is of such great importance a jury is not fair and impartial where its members have read the numerous inflammatory newspaper articles treating the crime and the suspect. Defendant argues that the necessity for his counsel, at the trial, to peremptorily challenge several veniremen due to their expressed opinions based upon the newspaper publicity supports this contention.
The State argues that the court did not abuse its discretion in denying the motion for removal of cause. It points out that out of the 92 veniremen served it was only necessary to examine 45 upon their voir dire to obtain a qualified jury of 12 men and refers to a case in which this Court, in a similar situation, held that no abuse had been committed where a jury free from fixed opinions was procured without exhausting the veniremen available in the county. Powell v. State, 1937, 131 Fla. 254, 175 So. 213. In Patterson v. State, 1946, 157 Fla. 304, 25 So.2d 713, this Court reached a similar conclusion.
This Court has consistently adhered to the rule that an application for a change in venue is addressed to the sound discretion of the trial court and so long as the statute is substantially complied with a ruling refusing to grant a change of venue will not be disturbed except upon a showing that there has been palpable abuse of discretion. Patterson v. State, supra; Jeffcoat *14 v. State, 1931, 103 Fla. 466, 138 So. 385; Wadsworth v. State, 1939, 136 Fla. 134, 186 So. 435; Shepherd v. State, Fla. 1950, 46 So.2d 880.
We take care to make clear, however, that every trial court in considering a motion for change of venue must liberally resolve in favor of the defendant any doubt as to the ability of the State to furnish a defendant a trial by fair and impartial jury. Every reasonable precaution should be taken to preserve to a defendant trial by such a jury and to this end if there is reasonable basis shown for a change of venue a motion therefor properly made should be granted.
A change of venue may sometimes inconvenience the State, yet we can see no way in which it can cause any real damage to it. On the other hand, granting a change of venue in a questionable case is certain to eliminate a possible error and to eliminate a costly retrial if it be determined that the venue should have been changed. More important is the fact that real impairment of the right of a defendant to trial by a fair and impartial jury can result from the failure to grant change of venue.
The case before us is dangerously close to one in which a defendant's rights were impaired because of the refusal to grant a change of venue. However, in fairness to the trial judge it must be said that the extent to which the minds of those in the county of the trial were infected by knowledge, prejudice, bias and opinions did not become apparent until the voir dire examination of those called for jury service in the case and after the trial judge was called upon to rule on the motion for change of venue.
In this case, as in most of those cited above, one of the grounds of the motion for change in venue was that newspaper publicity had inflamed the minds of the public against the accused. As pointed out in those and other cases such publicity has been held to not necessarily require a change of venue, since, in this day of extended distribution of news, a sensational crime incurs great publicity not only in the county in which it occurred but throughout most, if not all, of the State. In such cases it would be difficult to find a county in which the residents thereof had not heard or read of the crime and formed opinions thereon. See Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, 709, certiorari denied 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773.
The difficulty of preserving to one accused of crime a trial by a fair and impartial jury made up of jurors who "* * * come to the investigation of each case free from any preconceived impression of it whatever", as we said they should in Lamb v. State, 1926, 90 Fla. 844, 107 So. 530, 533, has increased in direct proportion to the admirable progress made by the various news media in increasing the range, intensity and effectiveness of the gathering and dissemination of news of events. The effect of publicity given crimes, in all their details, including statements of witnesses, prosecuting and enforcement officials, statements and confessions attributed to the accused, and other incidents, all of which connect or tend to connect the accused with commission of the crime or, in some cases, create public opinion in favor of the innocence of the accused, is without question one of the most perplexing problems in the administration of criminal justice in this State and in this Nation. Yet while the problem, which incidentally is not new, cries aloud to every democratic institution for solution, we in this State and Country have totally failed in solving it; rather, it has worsened.
The crux of the problem was aptly stated by Lord Ellenborough in Rex v. Fisher, 2 Camp. 563, 170 Eng.Rep. 1253 (K.B. 1811), when he said:
"If any thing is more important than another in the administration of justice, it is that jurymen should come to the trial of those persons on whose *15 guilt or innocence they are to decide, with minds pure and unprejudiced. Is it possible they should do so, after having read for weeks and months before ex parte statements of the evidence against the accused, which the latter had no opportunity to disprove or to controvert? * * *"
To those who are concerned with the administration of criminal justice, both generally and in individual cases, it becomes increasingly evident that pre-trial publication of matters affecting the guilt or innocence of a named individual of a crime actually impairs the ability of the State to furnish a trial "by an impartial jury" as intended to be guaranteed under Sec. 11, Declaration of Rights, Fla. Const., F.S.A. By their decisions this Court and others have evaded solution of the problem by holding that such publicity does not in itself require a change of venue, not on the ground that the accused's rights have not been impaired, but rather that because of widespread publicity the citizens of the other counties of the State have been exposed to the same knowledge of the case and therefore jurors drawn in any other county would be as likely to have extrajudicial knowledge and opinions as those in the county of the crime.
As long as the Constitution of this State guarantees an accused trial by "an impartial jury" the people of this State through their government in all its branches at all levels and all the institutions fostered or permitted under it are solemnly bound to do that which is necessary to preserve such a trial to every accused, whether he be guilty or innocent.
This responsibility can not be escaped nor can failure to furnish such a trial be excused on the ground that under existing conditions publicity given crimes, particularly sensational crimes, is so generally disseminated that it is impossible to empanel a jury of persons who are free from knowledge of the crime and of preconceived opinions of the guilt or innocence of the accused. Rather the answer is to remove the condition which creates the extrajudicial knowledge and preconceived opinions.
The certain way to do this is to follow the practice of the English system under which the courts have held it to be a contempt for newspapers to engage in pre-trial comment on the events, facts, statements or investigations involving a crime, insofar as such comment tends to affect the determination of pending causes. See 8 Halsbury's Laws of England (3d Ed. 1954), Contempt of Court, Sec. 2, pp. 9-10; Goodhart, Newspapers and Contempt In English Law, 48 Harvard Law Review 885 (1935). France follows a similar course. There newspapers may report about the public proceedings only; what precedes them as a rule may not be published. Similar restrictions exist in other European countries involving criminal proceedings. In each country the intended purpose is to prevent the premature influencing of jurors and judges and the resulting impairment of the orderly processes of a fair and impartial trial on the basis of evidence submitted solely during the official proceedings. Rothenberg, The Newspaper (1948).
But under the American system of administration of justice our courts have, except in rare instances, failed to utilize the law of contempt by publication; and our legislatures have not seen fit to pass statutes which would restrict the publication of pre-trial events affecting criminal matters, but rather the trend has been to grant the press the right to publish such matters irrespective of the harmful result on the rights of trial by an impartial jury. See Sullivan, Contempts by Publication, (3d Ed. 1941) Part Three, a Comparison of the Functioning of the Law of Contempt by Publication in England and America. Also see concurring opinion of Justice Frankfurter in Pennekamp v. State of Fla., 1946, 328 U.S. 331, 357 et seq., 66 S.Ct. 1029, 90 L.Ed. 1295, for a learned and logical discussion of the English system and the trial by newspaper in this country.
*16 Rather than resort to use of its power to punish by contempt publication of matters which affect the ability of the State to furnish a trial by an impartial jury, we think the courts should first call upon those who operate the media of news to consider their responsibility, under the constitutional guarantee of the free press which is theirs, to preserve the guarantee of trial by an impartial jury, which guarantee belongs to every person accused of crime and which is of equal importance to that of the free press. No institution of democratic government should be more interested in carefully and fully preserving constitutional guarantees than the press itself for such is one of the grounds, if not the principal ground, for the existence of a free press.
The basic reason for the free press is the discussion of public matters necessary to enable the people to reach sound conclusions based on knowledge and thereby to intelligently exercise their rights and duties as citizens. No one can question that a free press is as essential to the maintenance of our democratic government as the arm is to the hand
But while the intelligent exercise of the rights and duties of citizenship requires that the organs of the news inform the people of events which transpire about them, the guarantee of trial by "an impartial jury" requires that those called for jury duty will come to the trial of the cause free of knowledge of the events related to the cause and that their actions as jurors be based solely on evidence and argument in open court and the law applicable. Therefore, the publication of the details of the commission of crimes, especially as they connect or tend to connect a named person with guilt therefor or to establish the innocence of a named person, not only is not required in the public interest, but the preservation of the constitutional guarantee of trial by an impartial jury requires that such publication not be made. This limitation on the publication of such details of criminal cases would in no wise curtail the fullest discussion of public issues generally.
Responsible newspaper publishers have long recognized the need for restriction on pre-trial publication of details of criminal events, but the gathering and publication of news is as competitive a business as are the other facets of free enterprise and it is difficult for competitors to reach accord on a matter, important as it may be, which would affect their business interests. Nevertheless, in a spirit of traditional American cooperation we call upon those who in this State exercise the privilege of freedom of the press to turn their attention toward this problem and ask that they contribute to its solution by mutual self imposition of reasonable restrictions on the pre-tria publication of such details of the events surrounding crimes which can reasonably be expected to impair the right of trial by an impartial jury. By so doing the press would gain the greater respect of the public and would add immeasurably to its already great contributions to preservation of the rights and privileges of a free society under constitutional law.
We point out here that this discussion is in no wise related to publication of news related to the administration of justice generally, to the courts or to its officers in the performance of their duty, but pertains only to pre-trial publication of events pertaining to specific crimes as it affects the right of an accused to trial by an impartial jury.
Irrespective of whether the press determines to limit the scope of its pre-trial publication of such events there are other avenues through which the problem must be attacked.
Prosecuting officials, being lawyers, are strictly prohibited by Rule B, Sec. 20, Code of Ethics Governing Attorneys, 31 F.S.A., from making for publication statements which pertain to pending or anticipated litigation for the reason that such statements may interfere with a fair trial. All prosecutors must observe this canon and the courts must enforce its observation. That there was no violation of this canon *17 in the case now before us must be made clear.
Law enforcement officials likewise must be required to abstain from making pre-trial statements regarding the details of crimes under investigation by them, which statements tend to establish the guilt or innocence of one accused of the crime. There is nothing to prevent announcement of the commission of a crime or of an arrest of one suspected of committing it, but they should not publish matters relating to evidence which they have acquired, statements attributed to witnesses, or statements or confessions attributed to an accused. Publication of such statements, evidence or confession forms the basis for trial by newspaper. Further, such statements, evidence or confession either may not be submitted at the trial, or if offered may not be admitted, yet if those who sit on the jury have read the press version of them it is most difficult, if not impossible, for the human mind not to fill in from its extrajudicial knowledge that which is not offered at the trial or to determine the veracity of a witness by comparing the newspaper version of the facts with the testimony given at the trial. It is a tribute to the press that most believe as true what is written or spoken by the press media, yet it must be admitted that press reports are not always accurate and are seldom complete. Further, the accused has no means to answer them, nor is there any appeal from conviction on trial by newspaper.
If under existing rules and statutes the courts do not have the authority to prevent law enforcement officials from making such statements for publication, the legislature should either impose the limitation itself or authorize the courts to do so. Yet it would be far better if such officials would, out of a sense of American love of justice and fair play born of a recognition that publication of such matters is harmful to the rights of an accused, impose upon themselves a restriction against the making of such statements for publication.
The defendant attached 28 copies of the local newspaper to his motion for change of venue. The first issue was dated August 24th. It announced the murder of Mrs. Fagan. The next issue, dated August 26th, announced that Mr. Singer was wanted for questioning and thereafter each issue mentioned Mr. Singer in connection with the crime.
It is unnecessary here to recount in detail the contents of the newspaper articles for we have concluded that in themselves under existing rules of law they do not show that the trial judge committed palpable abuse of his discretion in denying the motion for change of venue. In this connection we do note that none of these articles made mention of the so called "confession" above referred to although most, if not all, of the other details of the crime which would tend to connect defendant with the commission thereof were frequently printed.
The effect of these articles, and of those appearing in other newspapers, on the impartiality of the veniremen who read them is in part shown by the extracts of testimony of the veniremen set forth hereafter, and is further shown in other parts of the record not detailed herein. It is this effect which was not known to the trial judge when he ruled on the motion for change of venue which has persuaded us to give the foregoing discussion on the problems presented by pre-trial publicity of the details of criminal matters.
In determining whether error was committed in the denial of the motion for change of venue we are not limited to consideration only of the motion and traverse and the matters submitted in support thereof. We are permitted to consider the whole record and have done so. Chisolm v. State, 1917, 74 Fla. 50, 76 So. 329; Hysler v. State, 1938, 132 Fla. 200, 181 So. 350.
As will appear later, we have decided that the defendant did not receive a trial by an impartial jury. However the record before *18 us does not evidence a general state of mind of the inhabitants of the county as would indicate that the trial court committed a palpable abuse of discretion in denying the motion for change of venue, but indicates rather that the error resulting in the selection as a juror of the venireman later discussed was specific and related only to that juror. The record does raise some doubt as to the impartiality of a fairly large number of the veniremen which might be indicative of the inhabitants generally, but we cannot determine error on doubt.
We conclude this point by saying that although it is a close question the defendant has not shown that the trial court committed a palpable abuse of his discretion in denying the motion for change of venue.
We will next consider defendant's appeal points which question the court's denial of his challenges for cause as to six of the twelve jurors. Six of the defendant's ten points on appeal are involved in this question.
The defendant used all of his peremptory challenges. His complaint is that because of the denial by the court of challenges for cause to various jurors, he was, even after utilizing all of his peremptory challenges, required to go to trial before a jury, some of the members of which were not qualified because of preconceived opinions, prejudice, and lack of impartiality.
Defendant challenged veniremen Davis and Carter on the ground that they had, in substance, been witnesses on behalf of the State in a material proceeding in the cause in that each had furnished an affidavit in support of the State's traverse to the motion for removal of cause. The court overruled the challenge for cause as to both jurors, but the defense peremptorily challenged Davis, who was excused. Carter was sworn and served as a juryman.
Section 913.03(11), F.S.A., provides that a challenge for cause may be made to an individual juror on the ground "that the juror was a witness either for the state or the defendant on the preliminary examination or before the grand jury or is to be a witness for either party at the trial."
Section 913.03, F.S.A., states that a challenge for cause may be made only on specified grounds and proceeds to list some twelve such grounds. No ground provides that a challenge for cause may be made where the juror furnished an affidavit for the prosecution on a traverse to a motion for removal of cause. We agree with the contention of the State that one so furnishing such an affidavit was not a witness "on the preliminary examination." No doubt the phrase "preliminary examination" has to do with the examination provided for in Chapter 902, F.S.A., an entirely different proceeding. In addition, the State cites authorities which we find support the holding that a juror is not disqualified merely because he has given evidence on the question of change of venue. State v. Wisdom, 1884, 84 Mo. 177, 185-186; Hardin v. State, 1899, 40 Tex. Cr. 208, 49 S.W. 607, 610; State v. Morse, 1914, 35 S.D. 18, 150 N.W. 293, 296-297; 50 C.J.S. Juries § 209; and 31 Am.Jur., Jury, § 165.
We conclude that veniremen Davis and Carter were not witnesses for the State under § 913.03(11), F.S.A., and that on this ground the trial judge was correct in not excusing them.
On appeal defendant also contends that venireman Davis should have been excused under § 913.03(10), F.S.A. because he had a fixed opinion about the case. The record reveals that Mr. Davis said he had followed the case "closely" by reading the Gainesville Daily Sun and, in response to questions on voir dire, also said that he had a "fixed opinion" about the case, that it would require evidence to remove it but that his mind would be just *19 as open to evidence contrary to his opinion as it would to evidence for it. He also stated that he was a close friend of Mr. Fagan.
We think Mr. Davis should have been excused for cause, but because he was challenged only on the ground that he had been a witness for the State and because we must reverse for other reasons we will not hold the trial judge in error for refusing to excuse him.
The defendant also raises as error the refusal of the court to excuse for cause Mr. Fred Stringfellow.
On voir dire Mr. Stringfellow was first examined by the court. He told the court that he had "to a certain degree" formed or expressed an opinion as to the guilt or innocence of the defendant, which opinion was based upon "newspaper articles and hearsay." He stated that if chosen as a juror he would render a fair and impartial verdict on the evidence in the case and the law as explained by the court.
However, subsequently, on questioning by the attorney for the defendant, Mr. Stringfellow answered as follows:
"Q. Do you think you can completely free your mind? A. Yes, sir, I think so.
"Q. And base your verdict solely upon the evidence or lack of evidence in this case? A. Yes, sir. I would endeavor to very much. I think I could.
"Q. You think so, but * * * A. But, I do have this prejudice ahead which I have to admit to you, so I will have that to overcome.
"Q. Would that prejudice, if you are a juryman, have anything to do with it if the case arrived at the state where mercy or lack of mercy were considered by the jury? A. Yes, it might.
"Mr. Knight: Challenge for cause, your Honor. A. I might say the nature of the case would have a bearing upon that."
The challenge for cause was denied and defendant used one of his peremptory challenges to excuse Mr. Stringfellow.
We think Mr. Stringfellow should have been excused for cause because of a reasonable doubt as to his impartiality and as to his ability to render a verdict based solely on evidence given at the trial free of the influence of his preconceived opinion and prejudice against the defendant, but again because the grounds of the challenge were not specified and because we must reverse for other reasons we will not find the refusal of the trial court to excuse him for cause to be error.
The defendant also challenged venireman Smith on the ground that he was a client of Mr. Fagan, but this is not one of the grounds specified in the statute.
Venireman Brownlee stated that he had an opinion as to the guilt of the defendant formed from newspaper articles, that it would require evidence to change that opinion, but if such evidence were produced he could and would change his opinion. He was challenged for cause but the specific basis for the challenge was not specified. For this reason and because we must reverse for other reasons no error will be found here.
Mr. Jim W. Shaw was another of the veniremen challenged for cause and who served on the jury.
In deciding the qualifications of Mr. Shaw it is necessary to set forth, at length, portions of the questions and answers on his voir dire examination.
Mr. Shaw was asked the following questions, among others, by the State and answered as follows:
"Q. Regardless of what you have read about the case and what you have *20 heard about it, do you feel if you are accepted as a juror that you could cast it aside and base your verdict upon the sworn testimony you hear from the witness stand and the law of the case as given by the court? A. I might.
"Q. What do you mean by `might'? A. There is some circumstances before, knowing some of the family, etc.
"By The Court: Q. What family are you referring to? The Burch family? (Mrs. Fagan, the deceased, was a member of the Burch family.) A. Yes, sir.
"Q. Did you know the deceased? A. No, sir.
"Q. What you are saying is that you knew her people. Is that it? A. Yes, sir.
"Q. Do you feel that that would influence you in making up a verdict, whatever that verdict might be? A. Well, I couldn't say positive, but it might leave a doubt."
"Q. Mr. Shaw, if the state fails to prove, or, rather convince your mind beyond and to the exclusion of a reasonable doubt that the defendant is guilty, would you give this defendant the benefit of that doubt and vote to acquit him, if the Court should charge you that is your duty? A. If possible, yes."
"Q. Why do you say `if possible', Mr. Shaw? You do not feel that your state of mind is such that you could follow the law as given you by the Court? A. It might be that some prejudiced, biased, subconscious opinion would cause me not to.
"Q. Am I to understand, Mr. Shaw, that because of the feeling you have for the family you have spoken of that you would convict this man regardless of what the evidence in the case might be? A. I stated one time before that my opinion might be biased subconsciously
"Q. Mr. Shaw, the Court has to be controlled by the fact of whether you would or would not be, and not what `might' be.
"The Court: Sometimes a man is not sure, Mr. Duncan.
"Q. I appreciate that fact. Are you unable to say definitely? A. Yes, I'm unable definitely to say one way or the other."
Mr. Shaw was thereafter questioned by the defense during which, among others, he gave the following answers:
"Q. Did you form or express any opinion as to this case from what you read? A. Yes.
"Q. Have you talked to people about this case? A. Yes.
"Q. Have you formed or expressed an opinion about the merits of this case from what you have read and discussed? A. Yes.
"Q. Would it take evidence to remove that opinion? A. Yes, it would.
"Q. Would it take substantial evidence to remove that opinion? A. Yes, I think it would.
"Q. Are you positive that that would not subconsciously influence your verdict in any way, the present opinion that you have? A. I wouldn't say whether it would or not."
"Q. If there was no testimony upon that point or upon some of the points on which you have formed an opinion, might that opinion take the place of testimony there in your own mind in arriving at your verdict? A. I don't believe it would. It might, but I don't believe it would.
"Q. Can you say positively that your opinion would readily yield to the *21 evidence and you would not be influenced by it in arriving at your verdict? A. I don't believe I would.
"Q. You don't believe you would be influenced by it? A. I don't believe I would.
"Q. If you are selected as a juror in this case would you put out of your mind everything that you believe about the case, other than the things that are definitely proven and established in your mind by the evidence. A. I think I would.
"Q. Can you tell me whether you would do that or not? I know you are trying to be very honest and I appreciate it. A. I can't say for sure, but I would try to.
"Q. You would try to, but you can't say for sure? A. That is right."
The defense then challenged the venireman for cause, saying "I do not believe he meets the required legal test on clearly being able to put his opinion out of his mind in reaching a verdict." The challenge was denied and the questioning continued.
"Q. In this case, Mr. Shaw, the defendant is presumed to be innocent. The fact that he is indicted is no evidence at all. Can you give him the benefit of that presumption at this time? A. Yes, to the best of my ability.
"Q. Do you have any doubt about being able to give him the benefit of that presumption at this time. A. Well, I don't guess so."
Then the court asked the venireman several questions as follows:
"Q. Mr. Shaw, let me ask you one thing. I see something in my notes. At the beginning of the trial or near the beginning you indicated that from what you may have read or heard that you formed an opinion about the case. A. Yes, sir, that's right.
"Q. And that it would, having formed it, it would, of course, take some evidence to remove it? A. Yes.
"Q. But I believe you felt your mind was competent and that you could serve as a competent juror in the case?
A. Yes, sir, as far as I am conscious or know I see no reason why I couldn't.
"Q. And you feel confident that you could and that you would base your verdict on the sworn testimony that comes to you at the trial? A. Yes, sir.
"Q. And you feel you can do that? A. Yes.
"Q. And you would do that. A. Yes."
Sec. 913.03, F.S.A., states that a challenge for cause may be made only on twelve grounds specified therein. We think the words used by the defense in challenging Mr. Shaw were sufficient to inform the court that the defense was relying upon Sec. 913.03(10), F.S.A., which reads as follows:
"That the juror has a state of mind in reference to the cause or to the defendant or to the person alleged to have been injured by the offense charged, or to the person on whose complaint the prosecution was instituted, which will prevent him from acting with impartiality; but the formation of an opinion or impression regarding the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the evidence."
This section of the statutes in essence reaches the same rule for use in determining the competency of jurors, as do the decisions of this Court.
*22 The rule by which competency of a juror who has formed or expressed an opinion on the guilt or innocence of an accused is to be determined, as expressed in the decisions of this Court, is well settled. The question was first treated by this Court in O'Connor v. State, 1860, 9 Fla. 215. In that case this Court, quoting from cases in other jurisdictions, pointed out that even in those days it was difficult "to procure a jury entirely unaffected by rumors touching the transactions upon which they are to pass," and that the human mind is such that it usually comes to some conclusion on that to which it is subjected.
The Court adopted, on page 219, as its own the statement that:
"`The true doctrine is, that if the juror's conceptions are not fixed and settled, nor warped by prejudice, but are only such as would naturally spring from public rumor or newspaper report, and his mind is open to the impressions it may receive on the trial, so as to be convinced according to the law and the testimony, he is not incompetent.'"
This rule, even though stated in different words, has been relied upon and followed consistently in all the cases decided by this Court where the question was involved. Montague v. State, 1880, 17 Fla. 662; Andrews v. State, 1885, 21 Fla. 598; Denham v. State, 1886, 22 Fla. 664; English v. State, 1893, 31 Fla. 340, 12 So. 689; Olive v. State, 1894, 34 Fla. 203, 15 So. 925; Brown v. State, 1898, 40 Fla. 459, 25 So. 63; Melbourne v. State, 1906, 51 Fla. 69, 40 So. 189; Lamb v. State, 1926, 90 Fla. 844, 107 So. 530; Blackwell v. State, 1931, 101 Fla. 997, 132 So. 468, 469, in which the rule is restated; Jeffcoat v. State, 1931, 103 Fla. 466, 138 So. 385 and Powell v. State, 1937, 131 Fla. 254, 175 So. 213.
This Court has adopted the rule which makes the question of the competency of a challenged juror one of mixed law and fact to be determined by the trial judge in his discretion. This decision will not be disturbed unless error is manifest. Blackwell v. State, 132 So. 468, supra, quoting from Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244, 247 and In re Spies, 123 U.S. 131, 8 S.Ct. 21, 22, 30, 31 L.Ed. 80, 90.
However, regarding the application of the above rule as to competence of jurors this Court has made other significant statements which are worthy of note and consideration.
In Andrews v. State, 21 Fla. 598, supra, at page 604, this Court said:
"* * * The fact that he states that if taken upon the jury he would give a verdict according to the evidence is not of itself sufficient to overcome the effect of what he has said as to the fixed character of his opinion. * * *"
In Olive v. State, 15 So. 925, supra, at page 926, this Court said:
"* * * [T]he statement of a juror that he can readily render a verdict according to the evidence, notwithstanding an opinion entertained, will not alone render him competent if it otherwise appears that his formed opinion is of such a fixed and settled nature as not readily to yield to the evidence. * * *"
In Lamb v. State, 107 So. 530, supra, at page 533, this Court, after reciting the historical evolution of trial by jury, said:
"* * * [W]e believe that every juror should come to the investigation of each case free from any preconceived impression of it whatever * * *."
In Walsingham v. State, 1911, 61 Fla. 67, 56 So. 195, at page 198, this Court quoted with approval several statements found in cases from other jurisdictions:

*23 "* * * `the object of the law is, in all cases in which juries are impaneled to try the issue, to secure men for that responsible duty whose minds are wholly free from bias or prejudice, either for or against the accused, * * *'." [State v. Hatfield, 48 W. Va. 561, 37 S.E. 626.] "* * * `Confidence in the trial by jury depends upon the purity of the tribunal, and the fairness of its decisions. To secure this, the trial must be by impartial men. Purity of the tribunal is the watchful care of the law, and "it has guarded against the influence of those passions most likely to pervert the judgment of the jurors in deciding upon the conduct and controversies of their fellow men." If the juror does not stand indifferent to the cause, he is not competent. If he has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law.' [Richardson v. Planters' Bank, 94 Va. 130, 134, 26 S.E. 413.] * * * `And we also think that, in criminal cases, whenever, after a full examination, the evidence given upon a challenge leaves a reasonable doubt of the impartiality of the juror, the defendant should be given the benefit of the doubt.' [Holt v. People, 13 Mich. 224, 227.] * * *"
In O'Connor v. State, 9 Fla. 215, supra, at page 222, this Court said:
"We make the suggestion upon the ground that jurors should if possible be not only impartial, but beyond even the suspicion of partiality."
In Johnson v. Reynolds, 1929, 97 Fla. 591, 121 So. 793, 796, this Court said:
"If there is a doubt as to the juror's sense of fairness or his mental integrity, he should be excused. * * *"
and then, quoting from Temples v. C. of Ga. Ry. Co., 15 Ga. App. 115, 82 S.E. 777, said:
"* * * `If error is to be committed, let it be in favor of the absolute impartiality and purity of the jurors' * * * which we interpret to mean that the mind of the proposed juror should contain no element of prejudice for or against either party in a cause to be tried before him."
Further, the Court stated:
"* * * If the proposed juror is affected by either state of mind [bias or prejudice], it cannot be said that he is fair-minded and impartial, and, if accepted as a juror, that he would be of that standard of impartiality which is necessary to prevent an impairment of the right to jury trial. It is difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias or prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful questioning declares his freedom from its influence. By what sort of principle is it to be determined that the last statement of the man is better and more worthy of belief than the former? * * *"
The above quotations must be construed as being guides to the trial courts in exercising their discretionary power in determining the competency of jurors. They demonstrate that the goal to be sought is a jury composed of persons whose minds are free of any preconceived opinions of the guilt or innocence of an accused, persons who can in fact give to an accused the full benefit of the presumption of innocence, persons who can because of freedom from knowledge of the cause decide it solely on the evidence submitted and the law announced at the trial.
These cases illustrate that if there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence *24 submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its own motion.
Too, a juror's statement that he can and will return a verdict according to the evidence submitted and the law announced at the trial is not determinative of his competence, if it appears from other statements made by him or from other evidence that he is not possessed of a state of mind which will enable him to do so.
Further we do not feel that the true test of the fixedness of an opinion in the mind of the juror is to be determined by whether the opinion will readily give way to the evidence. As pointed out by Justice Buford in Powell v. State, 131 Fla. 254, 175 So. 213, supra, at page 216:
"* * * The accused, guilty or innocent, is entitled to the presumption of innocence in the mind of every juror until every element of the offense charged against him has been proved by competent evidence adduced upon the trial beyond a reasonable doubt. This is not accomplished when a juror is taken upon a trial whose mind is in such condition that the accused must produce evidence of his innocence to avoid a conviction at the hands of that juror. * * *"
It is not enough that an opinion will readily yield to the evidence, for evidence of innocence is not required to be presented by the accused.
We think the true test to be applied should be not whether the juror will yield his opinion, bias or prejudice to the evidence, but should be that whether he is free of such opinion, prejudice or bias or, whether he is infected by opinion, bias or prejudice, he will, nevertheless, be able to put such completely out of his mind and base his verdict only upon evidence given at the trial. Lamb v. State, 107 So. 530, supra, at page 535, citing Hopt v. People, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708.
We realize that, to say the least, it is difficult, if not impossible, for any individual to completely put out of mind knowledge, opinions or impressions previously registered. Such cannot be erased from the mind as chalk is erased from a blackboard. More the reason then that in the struggle toward attainment of the perfect aim of trial by an impartial jury composed of jurors "whose minds are wholly free from bias or prejudice, either for or against the accused," the pre-trial dissemination of the knowledge which destroys the impartiality of the public from which the jury must be drawn should be restricted as discussed earlier in this opinion. The result of failure to do so is clearly demonstrated in this case, yet the press in this case did no more than that commonly done.
We then return to the question of Mr. Shaw's competence as a juror which question must be construed in light not only of the general rule established in O'Connor v. State, supra, but also in light of the other statements made by this Court, as above quoted.
It is difficult for any person to admit that he is incapable of being able to judge fairly and impartially. We think Mr. Shaw on voir dire examination did as much as he could to honestly express that he was of such a state of mind, consciously or subconsciously, that he was not sure he could render a verdict without being influenced by the opinion he had formed from what he had read and heard about the case and because of knowing decedent's family.
Nor do we feel that his subsequent statements, in response to questions from the trial judge, that he was competent to serve as a juror were sufficient to overcome the effect of what he had previously said as to his state of mind.
There is such a reasonable doubt as to the impartiality of Mr. Shaw and his being able to render a verdict on the evidence and law given at the trial free of the influence of his opinions and prejudices *25 that we feel he should have been excused from the jury when challenged for cause by the defense. In view of the fact that the defendant used all of his peremptory challenges, denial of the challenge for cause directed to Mr Shaw was reversible error.
Defendant next questions whether the lower court should have denied his objections to evidence of an independent crime committed by him, i.e. his alleged assault upon Mrs. Sasser. Defendant's position is that the general rule prevails in this instance, such rule being that evidence of another, independent crime committed by the defendant is inadmissible; but that even if an exception to this general rule was applicable the State failed to perform the essential prerequisite to admissibility of the evidence in that it failed to prove satisfactorily that the defendant was the one who committed such other crime. We find no error on this point.
The purpose of the testimony was to establish the identity of the person killing Mrs. Fagan and his intent, plan or design, or to clarify the character of the shooting of Mrs. Fagan, that is, whether or not it was accidental, as the defendant said it was in the notes written to the police on his arrest in Canada. These purposes made the evidence admissible as an exception to the general rule. Talley v. State, 1948, 160 Fla. 593, 36 So.2d 201. The question remains, however, whether the defendant was sufficiently identified as the person committing the assault on Mrs. Sasser.
Mrs. Sasser did not see the face of the man who attacked her although she was quite close to him, since his face was shielded by a hat. When she inquired "yes" three times upon seeing a man standing at her screen door the man did not reply but threw both hands to his eyes and rubbed them. Her husband testified that defendant would rub his eyes in such fashion when he became excited or angry. Mrs. Sasser based her identification of the defendant as her assailant upon that person's actions, mannerisms, posture, and silence upon being addressed. She said that "if you have been around a person for over a year you feel like you know them almost as well as you know your children." She had known defendant and been around him almost every day for months and he had frequently worked in her home.
Mrs. Sasser asserted, in reply to the question whether as a matter of fact, and not just in her mind, she actually and absolutely knew who fired the shot, "In my heart and soul, yes, I do."
Defendant contends this identification by Mrs. Sasser was no more valid than that of the witness in Henderson v. State, 1927, 94 Fla. 318, 113 So. 689. The witness there was confronted with a "lineup" of men and asked whether he could identify the man alleged to have committed the crime. He pointed one out and said "I believe that is the man." He had been under a table when the shooting occurred in which a man was killed. This Court ruled that had his testimony been the only testimony as to the identification a jury may have refused to convict. We are of the opinion that the identification given by Mrs. Sasser in this case was based upon much firmer ground. Also, it has been said that the evidence of the other crime need not prove the commission of the crime beyond a reasonable doubt but should at least make out a prima facie case. 1 Underhill's Criminal Evidence, § 207, p. 478 (5th ed. 1956); 22 C.J.S. Criminal Law § 690; 20 Am.Jur., Evidence, § 318; Annotation 20 A.L.R.2d 1012, pages 1035-1036 (1950). In an early case this Court held that the mere suspicion that the accused has committed some other crime is clearly inadmissible. Mann v. State, 1886, 22 Fla. 600. Here, however, the evidence does appear to be more than mere suspicion. We conclude that no error has been shown on this point.
*26 It is to be recalled that when the defendant was arrested by the Canadian police he requested counsel but then replied to questions propounded to him by the police, such answers constituting a "confession." Defendant contends that this confession was improperly admitted into evidence. In support of this contention defendant cites Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, which dealt with the rule, pertaining to federal courts, that a person arrested be taken without unnecessary delay before the nearest available commissioner. It was commented that the purpose of such rule was to prevent the evils of "third degree" investigations by the police. The Court stated that no delay in taking an arrested person before a commissioner, however brief, was to be used to give opportunity for the extraction of a confession. The court referred to its holding in McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, where it found that the restraint of the defendant was illegal and was under aggravating circumstances.
In United States v. Mitchell, 1944, 322 U.S. 65, 67, 64 S.Ct. 896, 897, 88 L.Ed. 1140 the court said:
"Review by this Court of state convictions presents a very different situation * * *. Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice."
The following appears in Annotation, 1 L.Ed.2d 1735, 1737 (1957):
"As a general observation, it may be stated that cases coming from a federal court in which the Supreme Court has held confessions admissible in evidence may properly be relied upon as showing that under the facts involved the use of the confession was not a denial of due process as guaranteed in the Fourteenth Amendment, while holding that a confession was inadmissible in evidence in a federal court cannot necessarily be relied upon as precedents justifying a reversal of a state court conviction based upon the use of a confession under similar circumstances."
It is, consequently, our conclusion that the instant case should not be governed by the rule in the federal courts as discussed in Mallory v. United States and McNabb v. United States, supra. And we find that we have reached the same conclusion previously in Finley v. State, 1943, 153 Fla. 394, 14 So.2d 844. In that case the oral and written confessions of the defendant, made in the jail soon after arrest, were admitted into evidence. In arguing that the evidence was inadmissible the defendant in Finley v. State, supra, relied upon McNabb v. United States, supra. This Court, 14 So.2d on page 845, stated:
"We have examined these cases and find that they were decided on other than constitutional grounds guaranteeing fair and impartial trial and prescribe a rule of decision for the federal courts that we are not bound by and do not elect to follow. * * *"
On this point also see the later cases of Crooker v. People of State of California, 1958, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448; Cicenia v. La Gay, 1958, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523.
Even if we were to follow the federal rule, we find no illegal restraint under any aggravating circumstances. Defendant was promptly advised that he was not compelled to say anything but that whatever he did write would be used against him. The trial court, in the absence of the jury, examined the police officer to whom the confession was made to ascertain whether it had been freely and voluntarily given. We find no suggestion that the defendant was subjected to "torture", physical or psychological. Due to the fact that the defendant was both deaf and dumb, we have the unusual advantage of noting what went on between him and the *27 police by examining the written communications between them. We find no error on this point.
We come now to the final point on this appeal. Defendant asserts that the argument of the State Attorney was so inflammatory, improper and prejudicial as to require a new trial.
As previously noted, the essential contention of the defendant on this appeal is not that the evidence was insufficient to support the verdict of murder in the first degree but that he was not given a fair and impartial trial. One of the reasons that defendant urges to support that he did not have a fair and impartial trial is the alleged inflammatory, improper and prejudicial remarks of the State Attorney. Defendant in effect argues that the jury was thereby improperly prejudiced in its consideration of a recommendation of mercy.
It is not for us to determine whether the defendant should have received a recommendation to mercy, that is solely for the jury to decide. But we are required in the case before us to determine whether the trial was so conducted as to prejudice the defendant in the jury's consideration of such a recommendation.
The defendant did not testify and offered no testimony in his defense. He therefore was given the right to opening and closing argument. After the defendant's attorney made his opening address to the jury, a Special Assistant State Attorney spoke for the State. No complaint is made as to his remarks. Then the State Attorney completed the address to the jury for the State. In his remarks the State Attorney made the following statements, among others:
"* * * What am I thinking? Mercy is granted. You become soft, you become sympathetic. He is sent to the penitentiary. What am I going to think? What is my family going to think? What are these back here going to think? What am I going to think?
"I have been your prosecutor for almost 19 years, and for three years prior to that I had the privilege and the honor of the same position that Osee had. Are you by your verdict, gentlemen, going to say to the prosecutors in this Nation that they have no protection for performing their duty? There's only one sure way! That penitentiary is not absolute inviolate. A life sentence doesn't mean a life sentence. It isn't literal."
Defense counsel objected to the italicized portion of the above copied statement. His objection was sustained and the jury instructed to disregard the statement.
The State Attorney continued:
"Gentlemen, I say to you again the penitentiary at Raiford is not inviolate."
Defense counsel objected, and the objection was overruled.
On the italicized portion of the above statement the State urges that there was no resultant harm to defendant and cites McKee v. State, 1947, 159 Fla. 794, 33 So.2d 50 and Phillips v. State, Fla. 1957, 92 So.2d 627, which cases involved discussions of parole of convicted persons by a trial court. The State also urges that it is common knowledge that a penitentiary is not inviolate and cites authorities in support of this contention.
We agree that, considered alone, the italicized statements of the State Attorney are not so prejudicial as to warrant a new trial although they were improper and were not proper discussion of the evidence or reasonable inferences to be drawn therefrom. Suffice it to say that the processes of government affecting the post conviction treatment of those involved as defendants in criminal proceedings are not the proper subject of arguments by either *28 the State or the defense, unless it be a subject properly in evidence before the jury.
In addition to the foregoing and those statements which follow, the State Attorney made reference to the children of Mr. and Mrs. Fagan being left motherless by the defendant's act, but from the voir dire examination it seems clear that this was common knowledge of the jurors and in view thereof, although the remarks were no doubt calculated to stir the emotions of the jurors, we do not find these statements regarding the children in themselves sufficient to warrant reversal for new trial. See Hathaway v. State, Fla. App. 1958, 100 So.2d 662, 664; People v. Dukes, 1957, 12 Ill.2d 334, 146 N.E.2d 14.
The State Attorney also made the following statements in his address to the jury:
"Now gentlemen, I find that I am a little emotional. I find myself in a position that I have never found myself before. And that is this: Just a short time ago, as a matter of fact, on June 8, 1956, my friend, your friend, Osee Fagan, stood where I am standing, this same defendant sat where he's now sitting, and as prescribed by law Osee did his duty, the same that I'm trying to do mine. What did he get for it? Look at him! Look at me! Look what it's done to me! * * *."
Later in his address the State Attorney said:
"And I say to you that to talk to anybody  I don't care who it is  about the supreme penalty is not a pleasant task. It isn't pleasant for me. To be perfectly honest with you, I'm so tight and I'm so highly emotional about this case until it is difficult for me to stand here before you. God knows what might happen to my family! I want to know that I can come down to this court house and I can stand and argue my case to a jury without any fear of reprisal, without someone sneaking out to my house in the dark and taking it out on my family. I tell you, gentlemen of the jury, I'm upset. And by your verdict you can either condone it  or you can do the sure thing, that he can never do it again. I don't mean those as harsh words, gentlemen, but I mean that as common sense. It's the only sure way.
"* * * I find myself so wrought up and so upset that I can't carry on any further. But I say this to you in closing, I implore you that from the facts and circumstances you have heard in this case, to base your verdict upon the facts and circumstances and say to the prosecutors of your nation that when they perform their duty that revenge will not be sought upon their family."
The State calls our attention to the fact that the defendant did not object to any portion of the statements of the State Attorney except on the two occasions above noted. Therefore, says the State, the defendant cannot now complain of such improper remarks.
As was said in Akin v. State, 1923, 86 Fla. 564, 98 So. 609, 612, cited by the State, the general rule in such matters is that:
"* * * A verdict will not be set aside by an appellate court because of such remarks or because of any omission of the judge to perform his duty in the matter, unless objection be made at the time of their utterance. This rule is subject to the exception that, if the improper remarks are of such character that either rebuke nor retraction may entirely destroy their sinister influence, in such event a new trial should be awarded regardless of the want of objection or exception. * * *" (Emphasis ours.)
It seems obvious to us that the above quoted statements of the State Attorney *29 were improper. We must, however, also determine whether or not they were of such character that neither rebuke nor retraction would entirely destroy their sinister influence.
The jury in this case knew that the deceased was the wife of a public official who had prosecuted the defendant. They had the right to and apparently did believe Mrs. Fagan was killed because her husband performed his duty in prosecuting the defendant. The plea of the State Attorney, in which he several times expressed emotion and fear for the safety of his family and asked the jury to protect his family from a similar fate at the hands of the defendant by giving defendant the death penalty, was a plea which was calculated to and would be most likely to impress and prejudice the jury against recommending mercy for the defendant.
In view of the fact that the jury was entitled to believe that defendant had killed Mrs. Fagan because of her husband's performance of his duty, the plea of the State Attorney became more than an abstract argument without basis in fact. It could be immediately and realistically connected to the events which had already transpired. Any jury would most likely react thereto so as to protect a public official from what appeared to be impending harm because of performance of his duty.
The statements of the State Attorney were obviously intended to convince the jury that they should not grant mercy to the defendant. He had the right and the duty to argue this question forcibly to the jury. But he should have argued it on the evidence before the jury without injecting the welfare of himself, his family and other prosecutors into the case, and without the expressions of emotion he made. He should not have asked the jury to withhold a recommendation of mercy because of what defendant might do to the State Attorney's family if he were not put to death. Yet, in short, this is what he did.
We doubt seriously that rebuke or retraction would have removed the impact of this thought from the minds of the jury.
We do not overlook the State's contention that because the evidence of the defendant's guilt is so great and convincing the jury would not have returned a recommendation of mercy, irrespective of the damaging statements, and that therefore the error becomes immaterial. Goddard v. State, 1940, 143 Fla. 28, 196 So. 596, and McMann v. State, Fla. 1951, 55 So.2d 538.
In Raulerson v. State, Fla. 1958, 102 So.2d 281, in an erudite opinion written by Mr. Justice Thomas, we dealt with the effect of improper statement of the trial court on the question of the jury's recommendation of mercy for the defendants. In the Raulerson case we said, at page 286:
"* * * And how are we to determine what effect it [the improper statement] had on the conclusion of the jury. Assuming for the moment the State's argument that the proof of guilt was `clearly established' we cannot agree with the State's contention that `there is no reason to believe that any verdict other than that of guilty as charged could possibly have been arrived at.' (Italics supplied) In this statement the possibility that a recommendation of mercy might be included in the verdict is ignored. * * * Who is there to gainsay that but for the questioned remark seven jurors would have recommended mercy? Not we. The difference, to the appellants, would have been the one between life and death. Even when a rcommendation of mercy is incorporated in the verdict, the defendant must have been proved `guilty beyond and to the exclusion of a reasonable doubt.' Davis v. State, Fla., 90 So.2d 629, 631. If the State's premise, that such was the degree of proof in this case, is accepted, it does not lead to the conclusion that death should result."
*30 We think the above statements apply with even greater force to the case now before us, because the improper statements in this case were directed specifically to the question of mercy.
The basic question to be decided in any criminal proceeding is the guilt or innocence of the defendant. But under § 919.23, F.S.A. the defendant is also entitled to have the question of a recommendation to mercy determined. He has the same right to have the question of mercy determined in a fair and impartial proceeding, free from prejudicial and inflammatory statements, as he does to have the question of guilt so determined. It is not enough that the proceedings affecting guilt or innocence were proper, if the proceedings prejudiced the jury's determination of a recommendation to mercy. In this case we have concluded that the statements of the State Attorney did or were likely to prejudice the jury in determining a recommendation to mercy for the defendant.
We make it clear, however, that we do not hold that the defendant was entitled to a recommendation to mercy. Rather, we only decide that he was entitled to have the jury determine this question in the same fair and impartial manner as the question of his guilt or innocence, and that he was denied such by the statements of the State Attorney.
We will not undertake to point out to the State Attorney the obligation which he has to assure a fair trial to those whom he prosecutes, or how he should perform his duties, for according to his own statements at the trial he then had served for 19 years in such capacity. He is an able public official and we do not charge him with deliberately violating the duty which he had to see that defendant was given a fair trial, which duty is equally strong as is his duty to faithfully and diligently prosecute the causes before him. It may well be that his error was occasioned by lack of control due to his emotional state. A prosecutor whose emotions are so disturbed or involved in a case that he cannot dispassionately and calmly perform his duties should excuse himself from the case in fairness to the State, the court and the defendant.
But it matters not whether the State Attorney made the damaging statements deliberately or not, the effect on the defendant's right to a fair trial was the same.
In view of our finding that the evidence was sufficient to warrant a conviction of murder in the first degree we regret that the cause must be remanded for retrial, but the solemn obligation placed upon us to guarantee a fair and impartial trial to the defendant on both the issue of guilt and of mercy requires that we must do so for the reasons above expressed.
Reversed for new trial.
TERRELL, C.J., and HOBSON, ROBERTS and THORNAL, JJ., concur.