MARCUS C. POWELL v. STATE.

175 So. 213.

Division A.

Opinion Filed June 11, 1937.

*W. P. Dineen,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell* and *James B. Watson,* Assistant Attorneys General, for the State.

BUFORD, J.—The writ of error in this case brings for review a judgment of conviction of murder in the first degree with the imposition of the death penalty.

The brief filed in behalf of Plaintiff in Error does not comply with Rule 20, but, because of the seriousness of the penalty imposed, we shall proceed to a determination of the questions apparently sought to be presented, the first· of which challenges the action of the court in overruling defendant's objections to the testimony of a witness, Albion W. Knight, insofar as the same purported to repeat literally, or in substance, the statements made by Mrs. Katie L. Powell, deceased, as related in a conversation between Knight and Marcus C. Powell, the plaintiff in error, prior to the homicide of Katie L. Powell which was the subject of this prosecution.

Mr. Knight was called as a witness and testified as to a conversation which he had with Marcus C. Powell shortly before the homicide and, over the objection of the defendant, he was allowed to testify as to what he told Powell had been said to him, Knight, by Mrs. Powell in regard to her intention to procure a divorce from Powell and retain her property.

This testimony was not objectionable as hearsay because it was testimony concerning and delineating a conversation between the witness and the accused and it was material testimony because it was testimony which would throw light upon the probable motive of Powell to cause the death of his wife before she had an opportunity to place the property beyond his reach or control. This testimony

would have been admissible as throwing light on Powell's motives although in truth and in fact Mrs. Powell had not had such a conversation with Knight. It is what Knight told Powell that is material and whether that statement of Knight was based on truth and fact or not was not material. Any facts which may tend to prove motive and are not too remote should be admitted in evidence. 30 C. J. 179; Bonner v. State, 67 Fla. 492, 65 Sou. 663; Kirby v. State, 44 Fla. 81, 32 Sou. 836; Gray v. State, 42 Fla. 172, 28 Sou. 53; Smithie v. State, 88 Fla. 70, 101 Sou. 276.

The cases cited by the plaintiff in error supporting the doctrine that "deceased's declarations previous to the homicide as to his fear that the defendant would kill him are inadmissible" are not applicable here.

Counsel says in his brief, "The testimony was particularly damaging to the defendant in that it conveyed the idea to the jury that the motive for the killing was to prevent the defendant's losing property right by the contemplated divorce." This is exactly why the testimony was admissible.

The second contention of the plaintiff in error is that the court erred in denying the defendant's challenge for cause of veniremen Van Meter, Howard, Flood and Andrue. Flood was the only one of the veniremen complained of who served on the jury. The examination of Mr. Flood shows, in part, the following:

"Q. I believe you stated to the Court that you have read some of these newspaper articles about this case?

"A. Yes sir.

"Q. Are you a regular reader of the Jacksonville Journal, or Times Union?

"A. Both.

"Q. Have you read the various articles as they appeared in those papers from time to time about this case?'

"A. Yes sir.

"Q. Have you read them with interest?

"A. Well, I read them all the way through. I did—anything I read I try to get everything out of it that there is in it.

"Q. Then you read those articles with the desire in view to reach some conclusion as to the cause of the death of Mrs. Kate L. Powell, didn't you?

"A. I found out all the paper had to say about it, yes sir.

"Q. Well, from reading those articles, did you finally come to any opinion?

"A. Yes sir.

"Q. As to the guilt or innocence of Mark Powell on the charge the Court explained to you, the killing of Mrs. Kate L. Powell.

"A. Yes sir.

"Q. Is that opinion pretty definite?

"A. Well, it can be changed. My opinion, what I read in the paper. I know Mr. Powell.

"Q. Well, from those discussions you had and reading the articles in the newspaper, you did come to a pretty definite opinion?

"A. I did form some opinion of it, yes.

"Q. And you still have that opinion?

"A. Yes.

"Q. Is that a fixed opinion?

"A. No, not fixed, because nothing that I read in the newspapers is fixed. I merely read what's there and get what they say about it. But I try to read the paper.

"Q. Would that opinion readily yield to evidence?

"A. Well, I am open to reason. I always see two sides to the question. I am not one sided in the matter.

"Q. But it would require evidence or a lack of evidence to remove that opinion from your mind?

"A. It would require some, yes sir.

"Q. It would require some evidence?

"A. Yes sir.

"Q. Just a little evidence or an appreciable amount?

"A. A reasonable amount. I form an opinion, like newspapers and things. I read the thing and form an opinion of what happened. I turn around and somebody tells me the facts of it, and I may change my opinion and may not.

"Q. You would have to be convinced your opinion was wrong before you changed it, wouldn't you?

"A. Yes sir.

"Q. And it would require a reasonable amount of evidence to do that?

"A. Yes sir.

"Q. I don't know if we understand what you mean by a reasonable amount of evidence.

"THE COURT: Let me interrupt. Mr. Flood gave a very intelligent answer. He says he may read a thing in a paper and form an opinion and then he may hear the facts and be guided by the facts. Isn't that right?

"A. Yes sir.

"Q. That is what he said in answer to your question. He didn't say it would take any evidence to remove it at that time. His answer was he did form an opinion, but he would hear the facts, and the facts would be controlling with him. See if he didn't say that.

"MR. DINEEN: Yes sir, but it didn't stop there.

"THE COURT: Well, we will see. I don't want to interrupt. I caught his answer and I thought it was all right. You can question him further.

"Mr. Dineen: Q. Mr. Flood, I am trying to understand you. Understand the state of your mind as to this opinion. Am I correct in saying as you said, you had formed a rather definite opinion, and that opinion would remain with you until it was removed by evidence, and it would take a reasonable amount of evidence to remove it, is that correct?

"A. I didn't say I had formed an opinion. There is a difference between an opinion and a definite opinion. That is the way I feel about it.

"Q. Is the opinion you formed still with you?

"A. I still have it, yes.

"Q. Did you not say it would remain with you until it was removed by evidence—

"A. A reasonable amount of evidence.

"Q. What do you mean by a reasonable amount of evidence?

"A. Well, I mean to say that if the facts in the case were such that any reasonable man would give a verdict of one thing, I think I would be reasonable enough to do it. I will be guided by the facts presented to me, regardless of what I have read, or any opinion that I have formed; but as it now stands, I do have an opinion.

"Q. When you say that opinion you now have would remain with you until removed by a reasonable amount of evidence, do you mean a substantial amount of evidence?

"A. A substantial change of mind, yes.

"Q. Enough evidence to substantiate the change of opinion in your mind from the fixed opinion you now have?

"A. Yes, sir.

"Mr. Dineen: Challenge for cause.

"The Court: Let me see if you get this clear.

"Q. Mr. Flood, could you hear the witnesses in this case on the witness stand, and observe other evidence that the court might admit herein, and upon that evidence and upon the law as charged you by this Court, render a verdict regardless of any opinion that you may now entertain, or which you have heretofore entertained? Let me ask you again. I know you boys; you are all mighty conscientious boys. I know the whole family of you. I know you want to give me the true answer. Let me approach it this way: is that opinion such that it would yield readily to the evidence? In other words, would you have any hesitancy after your opinion yielded readily to the evidence?

"A. I would yield to the evidence.

"Q. It would yield readily?

"A. Yes sir.

"Q. As I understand it, the opinion you have formed, was from reading the newspapers and talking around home?

"A. Well, I discussed it down at the company with two or three men.

"Q. None of them purported to give the facts, did they?

"A. No. One of the men said he knew Mr. Powell, but he did not state any of the facts in the case.

"Q. He didn't pretend to state the facts one way or the other?

"A. No, he didn't state anything about the case except his opinion about it, that was all.

"Q. You feel, if taken as a juror, you could sit here and calmly, fairly and dispassionately consider all the evidence in the case and render a verdict, regardless of any opinion you now retain or which you heretofore retained?

"A. Yes sir.

"Q. And that opinion would yield readily to any evidence?

"A. Yes sir.

"THE COURT: . Gentlemen, I think Mr. Flood is qualified.

"MR. DINEEN: We except to the Court's ruling.

"THE COURT: Yes sir."

The writer of this opinion thinks that the juror, Flood, was shown to be disqualified because the answers to the questions show that he had formed an opinion as to the guilt or innocence of Powell; that that opinion was formed principally from the reading of newspaper accounts of the homicide and that it would require evidence to remove that opinion and change his view as to the guilt or innocence of the accused. It was a matter of common knowledge that the reports of the homicide as contained in the newspapers referred to showed a strong case against Powell and purported to delineate the facts surrounding the homicide. Therefore, an opinion based upon those accounts might be presumed to be one holding the accused guilty. The accused, guilty or innocent, is entitled to the presumption of innocence in the mind of every juror until every element of the offense charged against him has been proved by competent evidence adduced upon the trial beyond a reasonable doubt. This is not accomplished when a juror is taken upon a trial whose mind is in such condition that the accused must produce evidence of his innocence to avoid a conviction at the hands of that juror. The majority of the Court, however, hold the view that the answers by the venireman to the questions propounded to him showed him to be qualified as a juror under the rule stated in Jeffcoat v. State, 103 Fla. 466, 138 Sou. 385, and in Blackwell v. State, 101 Fla. 997, 132 Sou. 468.

The third contention is that the court erred in admitting

the testimony of State witness Acosta in so far as same pertained to matters and things found or seen by such witness in the home or in the automobile of the defendant when Acosta was not armed with a search warrant and it also challenges the action of the court in admitting the testimony of other witnesses about the same and like matters.

The contention of the plaintiff in error is based upon the theory that the evidence against the accused was obtained by an unlawful search and seizure. Passing over the fact that the assignments of error upon which these contentions are based are rather vague, indefinite and uncertain, the record shows that Powell applied to the police for help in locating his wife and mother-in-law whom he claimed to be missing from the home where he lived with his wife, and that he knew nothing of their whereabouts. Before the bodies of the missing women were found Acosta, being a police officer, and other officers went to the home of the accused. They told accused that they desired permission to look about the house for the purpose of finding any clues by which they might locate the missing women.

The record shows that Powell told the officers to come in and help themselves and that he would be gald to help them out in any way possible. He was then not under arrest and had not been charged with the crime of murder. The officers went through the house and questioned Powell as to different rooms. The officers and others, including expert witnesses, testified as to what they found there.

The record shows that Acosta and others went into the backyard where they found the garage locked. Acosta went back into the house and asked Mr. Powell for the keys to the garage. Mr. Powell readily and without objection pulled out a bunch of keys and handed them to Acosta,

designating the key to the garage and the key to the car.
Then Acosta, without objection on the part of Powell, tes-
tified as to what was found in the house and what was
found in the automobile.

We hold that the record clearly establishes that the search
was made with the full consent, if not the express invita-
tion, of the accused and that all the things found in the
house and in the automobile, and the testimony adduced in
regard thereto which cast light upon the issues involved
were admissible and were not the product of an unreason-
able search or seizure. See Carlton v. State, 111 Fla. 777,
149 So. 767.

The attorney for plaintiff in error contended at the bar
of the court that error was committed in allowing testimony
to be introduced at the trial of Powell when he was charged
with the death of Katie L. Powell as to facts and circum-
stances surrounding the death of Mrs. Speer, who was the
mother of Mrs. Powell, who lived in the house with the
Powells and who the record shows was murdered at the
same time Mrs. Powell was murdered. The record shows
that both homicides were committed at the same time,
though not by the same physical act; that both bodies were
disposed of in the same manner and in the same place.
The evidence in regard to and of the circumstances sur-
rounding the death of Mrs. Speer constituted a part of the
*res gestae* of the death and circumstances surrounding the
homicide of Mrs. Powell and was, therefore, clearly ad-
missible.

The fourth contention is that the court erred in denying
motion for change of venue after the examination of 97
veniremen on the ground that it was impossible to secure
a jury free from fixed opinions. The contention is un-

tenable because the record shows that a jury free from fixed opinions was procured without exhausting available veniremen in Duval County. The mere fact that 97 veniremen had been examined without procuring a jury in a county of more than 150,000 population cannot be said to constitute ground for a change of venue. If that should be held to be a good ground for change of venue then it would follow that in a county of 15,000 population a failure to get a jury out of the first 10 examined would be ground for change of venue, or in a county of 30,000 population a failure to get a jury of the first 20 examined, would constitute a good ground for change of venue.

There was no abuse of discretion in denying motion for change of venue. See Leslie v. State, 35 Fla. 171, 17 Sou. 555; Jeffcoat v. State, *supra*.

The fifth contention of plaintiff in error is that the court erred in denying his motion for continuance.

The motion showed that defendant was indicted on March 10th, 1936; he was arraigned on March 11, 1936. His trial was set for April 8th, 1936. He procured counsel on March 21, 1936. On March 27, 1936, the defendant filed petition for habeas corpus. Writ of habeas corpus was issued and testimony was adduced before one of the Judges of the Circuit Court of the Fourth Judicial Circuit.

The record shows that the only purpose for the habeas corpus proceeding was that of preparing for the defense of the accused. The defendant had a full four weeks in which to prepare for his trial between the date of the indictment and the beginning of the trial. Not only that, but the evidence shows beyond any reasonable doubt that the defendant committed the homicide on March 1, 1936, and from then on he knew that he would have to prepare for trial.

The record having been carefully considered and, in the view of the majority of the Court, there being no reversible error, the judgment should be affirmed and it is so ordered.

Affirmed.

ELLIS, C. J., and TERRELL, J., concur.

WHITFIELD, P. J., and BROWN and DAVIS, J. J., concur in the opinion and judgment.

BROWN J. (concurring).—In the case of Jeffcoat v. State, 103 Fla. 466, 138 So. 385, (the opinion in which was written by Circuit Judge Gray, who tried the case now before us) this court pointed out that if a juror's opinion is not fixed and settled, and he is not warped by prejudice, but the opinion is only such as naturally springs from public rumor or newspaper reports, and the juror's mind is open to impressions to be received from the evidence, so that such opinion will readily yield to the evidence and the law, he is competent. The court there pointed out that the trial judge has the opportunity of personally observing the veniremen and their demeanor and manner of answering questions propounded; that he also has the opportunity of observing the manner of counsel in propounding questions. The court then said:

"Clearly, neitther of the veniremen held a fixed opinion, but only an opinion formed from reading newspapers. Neither of the veniremen knew the defendant, nor had discussed the case with any one. Both veniremen testified that such opinions as they had formed from reading the newspapers, would yield readily to the evidence. There was no error in overruling the challenge for cause, of these veniremen."

In the case of O'Conner v. State, 9 Fla. 215, the court pointed out that the true doctrine is that if the juror's conceptions are not fixed and settled, nor warped by preju-

dice, but are only such as would naturally spring from public rumor or newspaper report, and his mind is open to the impressions it may receive on the trial, so as to be convinced according to the law and the testimony, he is not incompetent.

In Blackwell v. State, 101 Fla. 997, 132 So. 468, text 470, the court pointed out that the human mind is so constituted as to render it almost impossible, on hearing a freely circulated report, to prevent it from coming to some conclusion on the subject, and that this state of affairs would always continue while the mind continues susceptible to impressions. To this the court added:

"If a conclusion or impression of the character last mentioned—one which would yield readily to the evidence—rendered a juror incompetent, in this day of rapid and efficient transportation and communication, it would be highly difficult, if not almost impossible, to procure a trial jury in the county where a crime of any moment was committed."

Tested by the above principles, we submit that this group of assignments of error concerning the qualifications of the veniremen, as well as the others referred·to in Mr. Justice BUFORD's opinion, are not well founded, and must fail.

The result is that the judgment below must be affirmed.

ELLIS, C. J., concurs.