139 So.2d 179 (1962)
Joseph ADJMI, Charles Adjmi, Emile Halfon, Also Known As John McGuerney, and Albert George, Also Known As Father Leon, Appellants,
v.
The STATE of Florida, Appellee.
No. 60-581.
District Court of Appeal of Florida. Third District.
February 22, 1962.
On Rehearing April 9, 1962.
*181 Sibley, Grusmark, Giblin, King & Levenson and Ben Cohen, Miami Beach, for appellants.
Richard W. Ervin, Atty. Gen., and David U. Tumin, Asst. Atty. Gen., for appellee.
Before PEARSON, TILLMAN, C.J., and CARROLL and HENDRY, JJ.
PEARSON, TILLMAN, Chief Judge.
The appellants, Joseph Adjmi, Charles Adjmi, Albert George and Emile Halfon, are four of six defendants who were charged with the crime of grand larceny. These four with one other were tried together. The sixth, Joseph Lependorf, could not be found. The jury returned a verdict of guilty as to each defendant tried, except for Leon Adjmi, who was found not guilty.
The court entered judgments of guilty against Joseph Adjmi, Charles Adjmi, Albert George and Emile Halfon and imposed upon each the maximum prison term of five years and a fine of $1,000.00. The fines carried the provision that upon default in their payment an added six-month imprisonment would be imposed.
The appellants have presented seven points; each has been considered. We have determined that the appellants, Joseph Adjmi, Charles Adjmi and Albert George, received a full and fair trial and that no reversible error has been made to appear as to their conviction. The appellant Emile Halfon was deprived of a substantial procedural right during the trial and accordingly is granted a new trial.
Under the first point the appellants urge that the trial judge committed error when he denied their motion for a change of venue. The day preceding the trial, the defendants filed a motion for a change of venue, asserting in substance that the mass media of publication, including radio, television and the newspapers had so aroused public sentiment against them that they could not be given a fair trial in Dade County. At the outset of the trial, the defendants presented their motion and were permitted to introduce evidence to support it. The court denied the motion.
In order to select a jury, 87 veniremen were called. The examinations on voir dire took almost three full days, and the defendants exhausted all of their peremptory challenges. They then renewed their motion for a change of venue. The court again denied the motion; the defendants refused to tender the jury which was nevertheless sworn to try the case.
There is no question of the law to be applied. Section 11, Declaration of Rights, Constitution of the State of Florida, F.S.A., guarantees to every accused the right of trial by an impartial jury. In order to be sure that an accused gets an impartial jury, the trial judge must order a change of venue when there is any doubt as to the ability of the State to furnish that impartial jury. Singer v. State, Fla. 1959, 109 So.2d 7, 14.
The trial judge must apply the law to the condition in the county where the trial is set. Having made his determination, his refusal of such motion will not be held as *182 error unless it appears that the court acted unfairly and committed a palpable abuse of discretion. The discretion referred to is judicial discretion guided by the law. Atkins v. State, 100 Fla. 897, 130 So. 273.
We have reviewed the exhibits (newspaper articles) submitted by the defendants to the trial court and the record of the voir dire examination of the prospective jurors. The newspaper reports of the charges against the defendants are numerous and in some instances colorful. This is inevitable in our society where a premium is placed upon the full reporting of cases of public interest. The charges against these defendants were interesting. It is true that a good many of the troubles of Charles and Joseph Adjmi culminated near the date of this trial; but the articles did not in the judgment of the trial judge amount to, as the defendants have charged, "a trial by the newspapers". We find nothing in them to suggest a reasonable doubt as to the ability of the State to furnish an impartial jury.
The review of the record of the voir dire examinations of the prospective jurors leaves us with the same result. The fact that 87 prospective jurors were called does not indicate that the court was straining to get a jury. The case was well-known and the trial judge scrupulously allowed all proper challenges for cause. The defendants and the State exercised many peremptory challenges. The jury selected was qualified. We conclude that no abuse of discretion appears. Cf. Powell v. State, 131 Fla. 254, 175 So. 213.
An outline of the evidence presented to the jury is now in order. The crime of which the appellants stand convicted is based upon their dealings with a lady well past middle life. In order to properly discuss the points urged by appellants, it is necessary to set forth some history of this relationship. Because the jury has accepted the version of the State's witnesses, we will present that version.
Mrs. McAlister resided in Miami, Florida. Her husband died five years before she met the defendants. He left her in sole possession of over one million dollars and a home where she lived by herself.
In October, 1959, when she was 72 years old, she met Charles Adjmi, a dealer in art objects. He was brought to her home by an acquaintance. Shortly thereafter Charles returned uninvited and brought with him a large painting, a replica of "The Last Supper". Charles asked her to store the painting for him because he had sold it to a gentleman who was suddenly called away. Then Charles took her to dinner and presented his brother, Joseph, who was in business with Charles. Joseph brought along a carved ivory bridge and some porcelain. After assuring her that the bridge was very valuable Charles begged her to loan them some money. Joseph and Charles told her that the money was necessary to save their business and that the bridge and the porcelain would be security for the loan. On November 10, 1959, she gave them a check for $6,500.00. The check was endorsed "Dresden Galleries by Joseph Adjmi, owner."
A few days later Joseph and Charles came to see her and told her that they had certain merchandise in "customs". This merchandise, they said, was already sold to "Marshal Field", but they needed $30,000.00 immediately to "redeem" the merchandise or they would lose the sale. Later evidence established that the Adjmis had no business relation with the "Marshal Field" store in Chicago. On November 17, 1959, she gave them a check for $30,000.00, and received a memorandum from Charles. The memorandum stated "January 1st, 1960 will sell Last Supper, January 15 will sell large ivories, large bridge. All monies go to Mrs. McAlister up to $30,000.00 + $6,500.00." The check was deposited in the account of J. & C.A. Corp. which was the business account of Joseph and Charles Adjmi.
Joseph and Charles visited Mrs. McAlister several times each week and brought her presents of linen handkerchiefs, strings of pearls and knicknacks. Together they *183 brought to her house for safekeeping a great many ivories and other objects. They explained to her that they had a purchaser for these items. He was described as a Mr. John McGurney, a very wealthy gambler from Las Vegas.
Joseph and Charles brought Mr. McGurney to inspect the merchandise. Mrs. McAlister heard them discussing a price. The bargaining started at one million dollars and reached an agreed price of $600,000.00, which McGurney said he would pay, "$400,000.00 in certified checks and $200,000.00 in cash." Mr. McGurney was Emile Halfon, one of the defendants. Shortly thereafter on December 17, 1959, Mrs. McAlister gave Joseph a check for $56,000.00 because he begged for money to get additional goods out of "customs". The money represented by this check went into the J. & C.A. Corp. account.
On the same day that McGurney, also known as Emile Halfon, inspected the merchandise, he mentioned in Mrs. McAlister's presence, that he understood "Father Leon" was coming from France to bring some priceless jades and paintings. Soon thereafter Charles asked and received on January 5, 1960, a $5,000.00 "loan" from Mrs. McAlister so that Charles might go to France and contact "Father Leon". The loan went into the account of J. & C.A. Corp.
Charles explained that Father Leon operated a lace factory in order to support an orphanage which he likewise operated. Both were said to be in France. Charles brought Father Leon to Miami. Joseph met them at the airport and brought Father Leon directly to Mrs. McAlister's home. Father Leon blessed her; she was deeply touched because they professed the same faith. Father Leon was the defendant, Albert George.
Mrs. McAlister gave Joseph $90,000.00 on January 7, 1960, and $100,000.00 on January 15, 1960, so that she might have a one-third interest in the lace factory and a lingerie factory. (The week's delay was so that she might liquidate some of her securities.) Of course, Father Leon was very grateful. He changed the name of the orphanage to "The Genevra McAlister Orphanage". He said the children in their gratitude went through the village collecting money, penny by penny, and that they bought a watch to send to her. She was to have a cottage on the grounds in Leon, France. Mrs. McAlister gave a check for $18,500.00 to pay the taxes on the lace factory. The check was deposited by Joseph in the corporation account he and Charles owned.
Father Leon made two trips to France and he brought to her house lace, paintings, white jade, and two vases from the Louvre. Charles and Joseph brought Halfon, alias John McGurney, to view the spoils. McGurney said he would pay $2,000,000.00 and Charles and Joseph said Mrs. McAlister would be returned all her advances.
But the money didn't come and Charles and Joseph said they needed more money; so she advanced more. On January 27th this money was paid by checks of $21,700.00 and $35,617.00 to the J. & C.A. Corp. Then there was no more money in Miami, but Joseph said that if she did not get more money she would lose everything.
Joseph and Mrs. McAlister went to Pittsburgh and liquidated her accounts there on January 29th. Joseph received a total of $143,418.00. But Joseph told her he would need more money to save what she already had in the lace and lingerie factory deals. She liquidated her stock accounts and gave him cashier's checks and cash totaling $71,791.50 on February 10th. The checks went into the Charles and Joseph Adjmi business account.
Mrs. McAlister owned some bonds. She tried to borrow money on them but at Joseph's suggestion she gave them to Halfon (McGurney). Halfon said he would give the $50,000.00 from the sale of the bonds to Joseph. This was in February. During that month Halfon (McGurney) received *184 from the Charles and Joseph business bank account checks totaling $153,250.00. These checks were each marked, "Commission on McAlister sale". This sum was in addition to checks for $9,500.00 in December, $20,000.00 in January and $254,500.00 in March. They were all endorsed and cashed at the bank. It may be noted that Albert George (Father Leon) also received many thousands of dollars from the same source.
Joseph and Halfon (McGurney) took Mrs. McAlister to Pittsburgh on February 18th; she had some assets there. The proceeds from these assets were converted to a check and signed over to the J. & C.A. Corp. The check was for $120,000.00. Joseph said the silk bill had not been paid and if they didn't pay the bill they would get no more silk.
While in Pittsburgh it was necessary for Mrs. McAlister to go into her safety deposit box there. Joseph came into the vault with her and wrapped in a newspaper bonds of a face value of $175,000.00. Mrs. McAlister never saw the bonds again but bonds of $115,000.00 face value were sold by Joseph Adjmi in Miami on February 19th.
The day that Joseph brought Halfon (McGurney), the gambler, to Mrs. McAlister's home, Charles had suggested to her a romance might be arranged. This suggestion was often renewed and culminated in a marriage between Mrs. McAlister and Halfon on February 29, 1960. That same day Mrs. McAlister testified she gave Joseph $11,000.00 and stock valued at $20,000.00. On March 3rd she turned over to Joseph a check from the sale of stock for $7,126.00. It was deposited to the account of J. & C.A. Corp.
Mrs. McAlister insisted that her new husband accompany her to Pittsburgh so that he could visit her family priest. This was preparatory to his promised conversion and a church marriage. Under the wise questioning of the priest, cracks in the new husband's story began to appear. Mrs. McAlister returned to Miami, to her solitary life and to get back her money.
The defendants introduced four bills of sale all signed:
 "Buyer Genevra M. McAlister
 Sellers Joseph Adjmi
 Charles Adjmi."
They were dated: January 23, 1960; February 16, 1960; February 19, 1960; and March 2, 1960. They purport to show purchases by Mrs. McAlister of listed art objects for $689,289.00. Each bill of sale contains the following language:
"The Buyer acknowledges to the Seller that by reason of the foregoing, she has established independently, and without the aid or influence of the Seller, the value, brand, antiquity, size, weight, description, condition of the goods herein sold; that she examined all goods and merchandise and accepts title to same as is. She also acknowledges that the above merchandise has been received in good order.
"The Buyer further acknowledges that any oral representations made by the Seller or any of his agents, servants or employees as to the value, brand, kind, antiquity, size, weight, description, condition of the goods herein sold, are not a part of this Agreement unless contained herein in writing."
Mrs. McAlister said she did not remember signing any of the papers but that she signed many papers at Joseph's request when he told her they were necessary to the orphanage or the lace factory. The jury believed her.
We have not combed the record for all of the money received by Joseph and Charles Adjmi, but the foregoing describes the procedure followed. As to the amount received, it was sufficient to qualify as grand larceny.
*185 We turn now to a discussion of appellants' second point. Under this point it is urged that the state failed to prove that the art objects were not worth what the defendants represented to Mrs. McAlister. Thereupon it is argued that because Mrs. McAlister admitted that she relied on the value of the merchandise stored in her house, no larceny by false pretenses had been proved. Clifton v. State, 76 Fla. 214, 79 So. 707, and Ex parte Stirrup, 155 Fla. 173, 19 So.2d 712, are cited by appellants for the rule that a false representation and reliance thereon are necessary elements to establish the crime of obtaining property under false pretenses.
It may be noted from the statement of the plan followed that there is doubt that all the money was obtained in reliance upon any single representation. Nevertheless, the rule cited in Clifton v. State, supra, and Ex parte Stirrup, supra, is met because it is clear that the theatrical staging of the complicated web of, falsehood to induce this elderly lady to part with her money was as much a part of the plan, as was the claimed value of the merchandise stored in her home.
Appellants' third point urges error because the trial judge denied their motion to require the State to elect one of the "numerous acts of grand larceny" upon which to proceed at the trial. The ruling was made under the following circumstances.
The appellants were charged in a single count. At the trial the State in its opening statement to the jury set forth its intent to prove the sequence of events which have been outlined in the statement of facts. The motion to compel an election was made at the close of the State's opening address upon the ground that the State intended to offer evidence of numerous acts of grand larceny. The motion was again made at the close of the State's case. In each instance the court denied the motion. Hamilton v. State, 129 Fla. 219, 176 So. 89, 112 A.L.R. 1013, and Green v. State, 134 Fla. 216, 183 So. 728, are cited as authority for the rule that when two distinct offenses are charged in an indictment or developed by the evidence, the State should be required to elect on which of the charges it intends to claim a conviction.
Here again the law is clear, but does the case before us come within the rule? We think not; the judge correctly found that the evidence revealed a completed plan without cessation or interruption. In the Hamilton case, supra, the receiving or concealing different articles of stolen property at different times and on separate and unconnected occasions constituted separate offenses. Here the taking of the many checks, although on different dates, as a result of the fraudulent representations of the defendants was a continuous transaction or proceeding instigated by one purpose and impulse. So the separate occasions when money was paid was prompted by one design, one purpose, one impulse and these "separate" occasions constituted a single or continuous act.[1]
The fourth point is presented only on behalf of appellant Halfon. This defendant offered no evidence. His codefendants, who were represented by the same counsel, did offer evidence. Before the defendants' side of the case began, common counsel for all defendants advised the court of Halfon's contention that any evidence offered would not be in his behalf. The court ruled[2] that Halfon, nevertheless, would *186 lose the privilege of opening and closing upon final argument to the jury. The appellant, Halfon, relies upon Faulk v. State, Fla. 1958, 104 So.2d 519, for reversal.
This point is clearly settled. The Supreme Court of Florida in the Faulk opinion has reviewed the cases and made a definitive application of the rule. It was held that section 918.09 Fla. Stat., F.S.A., provides that when a defendant offers no testimony in his own behalf except his own, he is entitled to conclude before the jury, and the fact that one defendant may offer testimony that could benefit another is the risk that the State assumes when it elects to charge and try two or more defendants collectively. The trial judge failed to follow the statute and the conviction of Emile Halfon must be reversed for a new trial.
By their fifth point appellants urge that the prosecuting attorney by comment called to the attention of the jury the fact that the defendants failed to testify in their own behalf. We need not cite authority for the rule that such comment is reversible error. It is well settled that any statement which is reasonably susceptible to interpretation as a comment upon the defendant's failure to testify, requires reversal.
In order to understand appellant's claim of error, it is necessary to refer to the record for the background of the statement which is charged to be a comment upon the failure of the defendants to testify. The principal basis of the defendants' defense was their position, urged by their counsel, that the sums of money they had received from Mrs. McAlister were, in fact, payments to them for the purchase price of a long list of art objects. In closing argument defense counsel urged that the transactions between Mrs. McAlister and the Adjmis were in fact sales and defense counsel then posed a question to the jury as to whether the State had ever denied that Mrs. McAlister received the merchandise which the defendants had alleged was sold to her. Specifically defense counsel argued as follows:
"They brought her attorney in. He couldn't deny that she had signed it. But that is when she got her money. But is that all she got? You heard the State tell you that they were going to bring in the exhibits and show you how they robbed this old lady. Did they bring it? The next room is loaded with merchandise that she got, brought in here by the State, but would they dare show you one article that she got? Why? Because the State must have been afraid that it would be appraised at far more than she gave out." (Emphasis supplied)
* * * * * *
"* * * She did not get swindled out of a dime. She owns all of these exhibits that are next door, the things that the State would not bring for you to see * * *"
In rebuttal to defense counsel's argument, the prosecuting attorney stated in final argument as follows:

"Mr. Cohen told you that the items contained in each of these exhibits is in the back room. I say he's wrong. They are not. That's right. Some of these items are  nothing here. Her name is on these; correct.
"Did you hear a single iota of testimony that they ever delivered the items *187 contained thereon? I told you in my opening statement that she doesn't know what she signed, that she signed anything they gave her. Did you hear a single iota of testimony that anything contained in these were delivered to her? No." (Emphasis supplied)
The question then is whether the words "Did you hear a single iota of testimony that anything contained in these were delivered to her? No.", may reasonably be construed as a comment upon the defendant's failure to testify? We think not, because the statements clearly refer to the failure of the defense to make complete their affirmative proposition of a sale. It would be a farfetched and strained construction of the sentence quoted to interpret it as a comment upon the failure of the defendants to testify when it was clearly and in context an attempted refutation of defendants' argument that the defendants had made a case of a bona fide sale. The appellants rely most heavily upon Gordon v. State, Fla. 1958, 104 So.2d 524 where the Florida Supreme Court emphasized that it has traditionally adhered to the rigid rule which precludes comment on defendant's failure to testify, regardless of why or how the prejudicial remark is made. We do not think that Gordon v. State, supra, applies inasmuch as it does not appear from a reading of the record that a prejudicial comment was made or that there is any reasonable possibility that the jury could have interpreted the remark in the manner appellants urge.
The opinion of the Supreme Court of Florida in Waid v. State, Fla. 1952, 58 So.2d 146, contains a holding which we find more in point with the present case than the Gordon case, supra. In the Waid case the appellant's attorney, while addressing the jury, had introduced the question of lack of testimony by the defendant. The court held that a defendant may not reap the benefits of failure to testify, such as the escape of cross-examination, and then claim the protection the statute affords if he plays upon that very failure himself by commenting upon his not having introduced testimony and the reason for it. While the case is not in point on the facts we think that the same reasoning is applicable to the statement which we are considering. Appellants' challenge to the State in their argument could only be met by a discussion of the lack of testimony to support their premise. The appellants should not now be permitted to take advantage of a fair reply to their own challenge.
The sixth point is directed to a sentence in the court's charge to the jury. There was no objection to the portion of the charge now claimed as error, nor was an assignment of error directed to this portion of the charge. The defendants, however, urged this point as fundamental error and that this court should review the same under Florida Appellate Rule 6.16(a), 31 F.S.A. The salient portion of the rule reads as follows:
"The court may also in its discretion, if it deems the interest of justice to require, review any other things said or done in the cause which appear in the appeal record, including instructions to the jury."
We have in the exercise of the discretion set forth in the rule considered appellants' contention that the sentence complained of was so prejudicial as to be fundamental error. The challenged sentence appears in the court's discussion of the province of the jury. After instructing the jury that the weight and credit to be given to the testimony of the witnesses is a matter solely for the jury, the court continued:
"The question of guilt or innocence of these defendants is for you, as members of the jury, alone to decide. The Court makes no suggestion to you as to what has or has not been proven; that is a matter of fact solely within the province of the jury.
"Now, I instruct you as the triers of the facts in this case you are to determine *188 under these facts beyond and to the exclusion of a reasonable doubt that the defendants are guilty of the violation of the Statute as heretofore read and defined to you."
Thereafter the court fully instructed the jury that in order for them to find the defendants guilty they must find that the State had proved all of the elements of grand larceny to the exclusion of a reasonable doubt. The court's instruction to the jury continues for some six pages of the record thereafter. The entire tenor of these instructions are that the jury as the sole judges of the facts must determine the question of guilt or innocence from the evidence. The court clearly stated that if the jury believed that the State had failed to prove the material allegations of the information beyond and to the exclusion of reasonable doubt then the appellants were entitled to that reasonable doubt and acquittal.
The instructions to the jury in this case must be read and taken as a whole in determining whether fundamental error has been committed. It is clear to us that no error has been made to appear because, as the Supreme Court of Florida pointed out in Haddock v. State, 141 Fla. 132, 192 So. 802:
"[T]he instructions should be considered as a whole, and, if as a whole, they are free from error, an assignment predicated on isolated paragraphs, or portions, which standing alone, might be misleading or erroneous, must fail."
Appellants' seventh point raises the question of whether a sentence is legal which imposes a maximum term of imprisonment plus a fine, in default of payment of which there is added a term of imprisonment. The punishment for grand larceny is provided for in Florida Statutes, Section 811.021(2), F.S.A.:
"* * * Imprisonment in the state penitentiary not exceeding 5 years, or in the county jail not exceeding 12 months, or by fine not exceeding $1,000.00."
Unquestionably the court was authorized, under Florida Statutes, Section 775.06 to punish by both imprisonment and fine.[3] The question presented concerns imposing the added term of imprisonment for failure to pay the fine after which the term of imprisonment might exceed the limits set in the statute authorizing imprisonment for the crime of grand larceny. Section 921.14, Fla. Stat., F.S.A., is authority for the imposition of a term of imprisonment for default in payment of a fine. This section reads as follows:
"Sentence of imprisonment for default of payment of fine or fine and costs. Whenever a court shall sentence and adjudge a person to pay a fine or a fine and costs of prosecution such court shall also provide in such sentence a period of time for which such person shall be imprisoned in default of the payment of the same. Such term of imprisonment shall be served in the county jail if the offense for which sentence is imposed is a misdemeanor and in either the state prison or the county jail if the offense for which the sentence is imposed is a felony, and the sentence shall specify where such term is to be served."
The appellants rely upon Lyle v. Walker, 100 Fla. 1457, 131 So. 383, which held that a county judge who had imposed the maximum imprisonment fixed by law and in addition thereto imposed a fine was within his jurisdiction, but when he attempted to impose an additional imprisonment *189 for failure to pay the fine he had exceeded his jurisdiction as defined by the law. That case was decided in 1930. Subsequent thereto, the legislature passed Section 921.14, supra, (Chapter 19554, § 260 Laws of Florida, 1939). The effect of this statute was to authorize a sentence for default in payment of a fine. This authorization, in effect, enlarged the legal sentence in each case where an imprisonment and fine are authorized. Cf. Dixon v. Mayo, Fla. 1953, 64 So.2d 176, and Williams v. State, 158 Fla. 415, 28 So.2d 691.
Having examined each point relied upon by the appellants for reversal we hold that the judgment and sentence as to Joseph Adjmi, Charles Adjmi and Albert George is affirmed. As to the defendant Emile Halfon, also known as John McGurney, the judgment and sentence against him is reversed and his case remanded for a new trial.
Affirmed in part; reversed in part and remanded for new trial as to Emile Halfon.

On Petition for Rehearing Granted
PER CURIAM.
The appellants, Joseph Adjmi, Charles Adjmi, Emile Halfon and Albert George filed a joint petition for rehearing. We granted limited rehearing "for the purpose of further oral argument and consideration of the question of whether the appellant, Albert George, is entitled to a new trial upon the ground that the trial judge erred in denying said appellant the privilege of opening and closing upon final argument to the jury."
It is apparent upon reconsideration that appellant George is entitled to a reversal of the judgment and sentence against him upon the same grounds that relief was accorded to Emile Halfon in the opinion and judgment of this court filed February 22, 1962. It is therefore ordered that said opinion and judgment is amended by the inclusion of the following additional paragraphs:
"As to the defendant Albert George, also known as Father Leon, the judgment and sentence against him is reversed and his case remanded for a new trial.
"Affirmed in part; reversed in part and remanded for a new trial as to Emile Halfon and Albert George."
The petition for rehearing is denied except for the amendment of our opinion and judgment as herein provided.
It is so ordered.
NOTES
[1] For a discussion on single or separate larceny predicated upon a series of acts over a period of time see annotation and cases cited therein at 136 A.L.R. 948. Also see 2 Wharton's, Criminal Law § 450 (12 ed. 1957); 52 C.J.S. Larceny § 53.
[2] "THE COURT: I'm ready to rule. Let the record reflect that the defendants, prior to offering any evidence, have announced to the Court that they intend to offer Defendants' Exhibit A-2 for Identification, Defendants' Exhibit A-4 for Identification, Defendants' Exhibit A-5 for Identification, and Defendants' Exhibit A-8 for Identification and A-9.

"MR. ST. JEAN: That's about all, your Honor. We may not use  Four contracts.
"THE COURT: They are withdrawing A-9. They are offering these in behalf of defendants Joseph Adjmi and Charles Adjmi.
"It is the ruling of the Court that if these are offered into evidence, that they enure to the benefit of all of the defendants, and for that reason the defendants would be precluded from having the closing argument."
[3] Section 775.06, Fla. Stat., F.S.A., provides:

"* * * and whenever the punishment is prescribed to be fine or imprisonment (whether in the state prison or county jail), in the alternative, the court may, in its discretion, proceed to punish by both fine and such imprisonment."